E. M. Godson v. Commissioner. R. Godson v. Commissioner.
Godson v. Commissioner
Docket Nos. 4913, 4914.
United States Tax Court
1946 Tax Ct. Memo LEXIS 132; 5 T.C.M. (CCH) 648; T.C.M. (RIA) 46182; July 24, 1946
Douglas D. Felix, Esq., for the petitioners. Edward L. Potter, Esq., for the respondent. HARLAN Memorandum Opinion HARLAN, Judge: This proceeding involves asserted deficiencies in income tax for the calendar years 1940 and 1941 as to R. Godson and for the calendar year 1941 as to E. M. Godson and a delinquency penalty of 25 percent against E. M. Godson for failure to file a return for the calendar year 1941, as follows: 25%
Delinquency
Taxpayer
Year
Deficiency
Penalty
R. Godson
1940
$12,634.15
1941
191.67
E. M. Godson
1941
217.50
$54.37
The issues raised by the pleadings will be stated consecutively in our facts and opinion. The cases were consolidated for trial. Petitioners are individuals residing at 6780 Collins Avenue, Miami Beach, Florida. They filed their income tax returns with the collector of internal revenue, Jacksonville, Florida. Issue I The question presented by this issue is whether E. M. Godson is entitled *134 to file her first income tax return on a fiscal year basis. [The Facts] E. M. Godson was formerly a resident of the Dominion of Canada. She first came to the United States in 1938. Prior to October 24, 1940, she did not have sufficient income from any source to require her to file a Federal income tax return. On or about October 18, 1940, C. W. Ellis, a public accountant, opened a set of books for petitioner E. M. Godson, consisting of a journal and a general ledger in which were kept all entries of receipts and disbursements after that date. The books were kept on the cash basis. Entries were made from receipts of payment and written memoranda furnished the accountant by petitioner. The income tax returns for petitioner were prepared by Ellis from the petitioner's books. The first return was prepared for the fiscal year beginning October 1, 1940, and ending September 30, 1941. This first return was filed within seventy-five days from September 30, 1941. Subsequent returns were filed on the same basis. The respondent determined that petitioner was not entitled to report her income on a fiscal year basis, and asserted a 25 percent delinquency penalty against her for failure *135 to file an income tax return for the calendar year 1941. [Opinion] The respondent admits that petitioner kept a regular set of books for the years involved but contends that there is no evidence that the books were kept or closed periodically on a fiscal year basis. We do not agree with this contention. The evidence establishes that the books were opened on or about October 18, 1940, and kept by a public accountant who also prepared petitioner's income tax returns. These returns were prepared on a fiscal year basis, ended September 30. From the record before us it appears that petitioner kept her books on a fiscal year basis. Nothing in the record impels the conclusion that the method used would not properly reflect her income. Under these facts we are of the opinion that petitioner's annual accounting period ended on September 30, 1941, and she properly reported her income on the fiscal year basis within Section 41, I.R.C. She is, therefore, not liable for a penalty for failure to report on a calendar year basis. Cf. Brooklyn City Railroad Company, 27 B.T.A. 77 aff'd. 72 Fed. (2d) 274. Issue II The second issue is whether *136 Godson Properties was entitled to deduct, in the year 1941, the depreciated cost of a portion of a building which it demolished in that year in connection with the erection of a hotel building on the property. [The Facts] Godson Properties, a partnership, composed of petitioners, was formed about October 18, 1940. About November 14, 1940, it purchased a property at Surfside, Florida, at a cost of $28,500, on which there was situated a building containing approximately 47,000 cubic feet. The following June or July a portion of the building, containing approximately 10,000 cubic feet, was demolished in connection with the erection of a hotel building on the property. Petitioner R. Godson allocated the purchase price of $28,500: $14,500 to the land and $14,000 to the building. The property was purchased for a business purpose. In its partnership return of income for the year 1941 Godson Properties deducted $2,812.50 representing the depreciated cost of the portion of the building razed. In determining the deficiency in question the respondent treated the depreciated cost of the portion of the building razed as a part of the cost of the real estate and denied the deduction. *137 The petitioner contends that the property was purchased with the intention of renting it pending a rise in value when it could be sold, and that the intent to raze a portion of the building did not arise until after it had been purchased. [Opinion] The respondent contends that the property was purchased by petitioner with the intention to raze a part of the building and erect another building thereon and that the petitioner sustained no deductible loss on account of the demolition. He argues that the facts negative any intent on the part of the petitioner to make use of the building during the period intervening between the purchase of the property and the demolition of a portion of the building in connection with the erection of the new building. While the facts are meagre we believe that they support the respondent's view. Petitioners purchased the property about the middle of November 1940, at the beginning of the winter season. E. M. Godson testified that they purchased to rent for the production of income, but there is no evidence in the record that any effort was made to rent it between the time when it was purchased and June or July, 1941, when a portion of it was *138 razed in connection with the erection of a hotel which included the remaining portion of the old building. In this respect the case differs materially from C. C. Watson, 15 B.T.A. 422, where the property was rented for more than two years before the buildings were demolished. There is no direct evidence that the plan to build the hotel originated after the purchase of the property and when all the facts are considered we are of the opinion that the intent to erect a hotel in connection with the old building existed at the time of the purchase of the property. We hold that the depreciated cost of the portion of the old building razed was a part of the cost of the land and not a deductible loss. Issue III The question presented by this issue is whether the rental value of a residence owned by Ocean Front Properties, Inc., and occupied by petitioner R. Godson, during a portion of the calendar years 1940 and 1941, should be included in his income for these years. [The Facts] Ocean Front Properties, Inc., was a corporation, all of the stock of which was owned by petitioner R. Godson. It owned various properties in or about Miami and bought and sold real estate. *139 Petitioner was general manager of the corporation and looked after all its business affairs. In the latter part of 1940 and during 1941 Ocean Front Properties, Inc., owned a residence at 5800 Pine Tree Drive, Miami Beach, consisting of living room, dining room, kitchen, six bedrooms and four bathrooms. The corporation did not fully furnish the house but kept only a skeleton amount of furniture in it. The house was held for sale and it was felt it could be better protected and more easily sold if someone was living in it than if allowed to stand vacant. Petitioner and his wife moved into the residence at 5800 Pine Tree Drive, from an apartment in Oceanic Villas about November 1940. They thereafter occupied the residence during November and December of 1940 and up to about Thanksgiving day 1941. They occupied one bedroom, living room, dining room and kitchen using some of their own furniture. It is petitioner's contention, that he occupied the property during this period to protect and conserve it and to show it to prospective purchasers; that he owned other property in which he could have resided during the period; that his occupancy was solely for the convenience of the corporation *140 and that the value of the living quarters was not income to him under the applicable Regulations. Petitioner admits that the fair rental value of the property was $60 per month. The respondent contends that petitioner, being in control of the corporation was free to make a choice of residences; that his occupancy of the property was for his own convenience and that to the extent of its rental value he received taxable income. [Opinion] Regulations 103, Sec. 19.22(a)-3 as amended by T.D. 4965, C.B. 1940-1, 13 provides: Compensation paid other than in cash. - If services are paid for with something other than money, the fair market value of the thing taken in payment is the amount to be included as income. If the services were rendered at a stipulated price, in the absence of evidence to the contrary such price will be presumed to be the fair value of the compensation received. If a corporation transfers to its employees its own stock as compensation for services rendered by the employee, the amount of such compensation to be included in the gross income of the employee *141 is the fair market value of the stock at the time of the transfer. If living quarters such as camps are furnished to employees for the convenience of the employer, the ratable value need not be added to the cash compensation of the employees, but if a person receives as compensation for services rendered a salary and in addition thereto living quarters, the value to such person of the quarters furnished constitutes income subject to tax. * * * Obviously the Regulations contemplate a situation where living quarters are furnished an employee in order that he may be near or more accessible to the place of his employment, not for his own convenience, but for the convenience of the employer. That, in our opinion, was not the situation here. The petitioner was the general manager of the corporation. Ordinarily, the duties of a general manager do not include the occupancy of property held for sale by the corporation in order to protect it from vandalism or to show it to prospective customers. Such occupancy might be incident to the employment of a salesman, but there is nothing in the record to indicate that petitioner was a salesman or received any compensation as such. From the facts *142 before us it appears that about November 1940, petitioner, having leased Oceanic Villas, in which he occupied an apartment, moved to the property on Pine Tree Drive which was owned by the corporation in order to protect the property and expedite its sale by showing it to prospective purchasers. These were services which were performed for the corporation. Since he paid no rent and, so far as the record shows, received no other compensation, it is a fair assumption that he had the use of the property as compensation for the services performed. Certainly there is no support in the record for treating the occupancy as a gratuity of the corporation or as solely for its convenience. Cf. Percy M. Chandler, 41 B.T.A. 165, aff'd. 119 Fed. (2d) 623; Ralph Kitchen, 11 B.T.A. 855. The agreed rental value of the property ( $60 per month) is includible in petitioner's income. Issue IV Two questions are presented by this issue; (1) Were the amounts paid or credited to petitioner R. Godson by Ocean Front Properties, Inc., in 1940 and 1941, as reimbursement for a portion of the expense of operating an automobile, taxable income to him in these years, *143 and (2) Were the sums paid to petitioner R. Godson by the partnership, Godson Properties, as a portion of the expense of operating an automobile in 1940 and 1941 deductible by the partnership in these years. [The Facts] During the calendar years 1940 and 1941, petitioner R. Godson used an automobile for the benefit of both Ocean Front Properties, Inc. and Godson Properties, the former being his wholly-owned corporation and the latter being a partnership comprised of himself and petitioner Edith M. Godson. The corporation own properties scattered from Coral Gables, Florida, to Golden Beach, Florida, a distance of approximately 20 miles. The partnership, also, owned several properties in different locations. Petitioner, who was general manager for the corporation, used the automobile in looking after both the corporation's and the partnership's properties. In managing these various properties it was necessary for petitioner to come to the down-town area of Miami from Miami Beach daily, in addition to the trips he was required to make to the locations of the properties and to other sites which the corporation was endeavoring to buy. In coming from Miami Beach to Miami he paid *144 the Venetian Bridge tolls as well as parking fees of fifty to seventy-five cents a day. He paid all of the running expenses of the car, such as gasoline, oil and minor repairs. Petitioner was reimbursed for all of the aforesaid expenses at the rate of 6" per mile for the total mileage he traveled. During the calendar year 1940, the corporation paid him 2/3 of that total expense, or $360, while the partnership paid him 1/3 of that total expense, or $180. This allocation was decided upon because the corporation's interests were more extensive during 1940 than those of the partnership. In 1941, however, since the corporation had parted with a large asset. which had required a lot of travel, and the partnership had acquired additional property, this allocation was changed to 1/3 to the corporation, or $220, and 2/3 to the partnership, or $440. In determining the milege traveled, the speedometer reading at its nearest round figure would be transmitted to the auditor. The respondent determined that reimbursement by the corporation to Mr. Godson was income to him for the calendar year 1940, and refused to allow the partnership to deduct as an expense for the calendar years 1940 and 1941 *145 the sums it paid to petitioner as reimbursement for the automobile expense. The respondent concedes that such expenditures as petitioner R. Godson actually incurred in the operation of the automobile in the ordinary and necessary business of the corporation and of Godson Properties, are deductible. He contends however, that the petitioner did not keep any records of his expenditures in operating the automobile and the amount allowable is not determinable from the evidence in the record. The petitioner contends that the sum of 6" per mile which he used to compute the expense is reasonable and not in excess of the amount expended and that the basis of allocation between Ocean Front Properties, Inc., and Godson Properties was reasonable and fair. The respondent apparently does not question the fairness of the allocation of expense between the corporation and the partnership but argues that the charge of 6" per mile was only an estimate and that no allocation was made between personal and business use. [Opinion] The petitioner testified that he made the estimation on the basis of many years experience with cars, and that it included expense of gasoline and oil, parking and *146 bridge tolls and minor repairs, but nothing for the use of the car. In coming down town which he had to do daily, there were fees for crossing the Venetian Bridge and parking fees of from fifty to seventy-five cents a day. In the light of his testimony we think 6" per mile a reasonable estimate for the cost of operating the automobile. The amounts received by petitioner from Ocean Front Properties, Inc., and Godson Properties in reimbursement for the expense of operating his automobile in connection with his business is not taxable income to him. Ned Wayburn, 32 B.T.A. 813. We further hold that the amounts paid by Godson Properties in reimbursement for operating expenses of petitioner's automobile used in the business of the partnership was an ordinary and necessary expense and deductible in computing net income of the partnership. Issue V Did Godson Properties sustain a loss during the calendar year 1941 from the abandonment of a building project in Surfside, Florida? [The Facts] In the summer of 1941 Godson Properties, a partnership comprised of petitioners, contemplated erecting a hotel at 8995 Collins Avenue, Surfside, Florida. Plans and specifications *147 were drawn for the hotel and submitted to the City of Surfside with application for a permit. The plans called for the building to be erected closer to the Street line than the existing zoning ordinance would allow. Petitioners obtained the services of an attorney to represent him before the city council to secure the permit. The attorney presented the petition to the council, drafted the proposed changes in the by-laws and attended various meetings. The council amended its by-laws and granted the permit and work on the construction of the hotel was begun. The Surf Club objected to the location of the building and the council canceled the permit without notice. The petitioners then hired other lawyers and began an action to have the permit reinstated. The case was carried to the Supreme Court of Florida and after "many, many" months the Supreme Court decided the case against them. After the litigation was concluded petitioners "ultimately" built a hotel on the property which was smaller and different from the one originally planned. In 1941 (from March 10 to November 24) Godson Properties spent $1,429.61 in obtaining the building permit and in trying to have it reinstated after *148 it had been canceled. The expenditures consisted of attorney's fees and court reporters' fees. It also spent during that year $72.01 for minor items in getting ready to construct the hotel. The respondent disallowed these expenditures as deductions to Godson Properties in 1941. The petitioner contends that Godson Properties abandoned its original building project during the same year in which it was undertaken and it was, therefore, entitled to deduct as a loss the sums expended during that year on the project prior to its abandonment. [Opinion] The respondent contends that the original plans for the construction of a hotel were not abandoned during the taxable year and therefore the claimed loss must be denied. On the evidence before us the respondent must win. The burden was on petitioner to prove that the project was abandoned in the taxable year. This he has failed to do. There is testimony that the project was begun in the summer of 1941; that there were plans drawn which were presented to the city council; that a draft of changed by-laws was also prepared and presented to the council; that the changed by-laws were adopted and a permit issued; that construction was *149 started; that the permit was thereafter canceled and that the case was thereafter taken to the courts. The petitioner testified that after "many, many" months the Supreme Court of Florida handed down a decision adverse to petitioners. There is also evidence that a payment for attorney fees was made on November 24, 1941. While this evidence shows expenditures made in 1941 it does not show that the final decision to abandon the project occurred in that year. In fact the testimony leads us to believe that it was not and petitioner admits on brief that the final decision of the Supreme Court of Florida was June 26, 1942. Section 23 (e) (2) of the Internal Revenue Code and Section 19.23 (e)-3, Regulations 103, permit the deduction of business losses such as we have here but such losses are only deductible in the year the enterprise was abandoned. Tom (Fayette T.) Moore, 19 B.T.A. 140. Since petitioner has not shown that the enterprise was abandoned in the taxable year, the respondent is sustained. Issue VI Was the entire net income of Godson Properties for *150 the calendar year 1940 taxable to petitioner R. Godson? [The Facts] During the summer of 1940 the petitioners, who are man and wife, discussed the formation of a partnership for the conduct of certain business affairs, the title to all properties which the partnership might acquire to be carried in the name of R. Godson. On October 18, 1940 a written partnership agreement was entered into between petitioners which provided among other things that the partnership should be carried on under the name of "Godson Properties"; that it should begin October 18, 1940 and continue until dissolved by mutual consent; that the capital should be $10,000, one-half to be contributed by each party, and each party to share equally in all profits and losses arising from partnership operations, and that all assets of the partnership should be carried in the name of the partners as "an estate by the entireties." Subsequently, on February 13, 1941, petitioner Edith M. Godson was granted a license to take care of and manage her own estate and property, and to become a free trader under the laws of the state of Florida. Prior to October 17, 1940, certain real estate known as Oceanic Villas Apartment *151 Hotel was owned by Ocean Front Properties, Inc., a corporation owned and controlled by petitioner, R. Godson. Negotiations were under way to lease this property and R. Godson instructed his attorney to prepare a deed conveying it to him for the partnership. Subsequently petitioners arranged with their attorney to have it conveyed to them jointly as tenants by the entirety and on October 15, R. Godson so notified his attorney by letter. The attorney then advised him that inasmuch as negotiations with the prospective lessee were in a delicate state, he did not consider it then advisable to make further changes in the record title than had been planned. As an alternative suggestion, however, the attorney stated that he would protect Mrs. Godson's interest by including her as a lessor and, in the meantime, prepare deeds creating an estate by the entireties, but withhold their recordation until such time as the lease had been completed and recorded. On or about October 17, 1940 a deed, dated October 1, 1940, was executed by the officers of Ocean Front Properties, Inc., conveying the Oceanic Villas Hotel property to petitioner R. Godson. This deed was filed for record October 18, 1940. *152 On October 18, 1940, R. Godson, joined by his wife Edith M. Godson, deeded the Oceanic Villas Apartments to Charles B. Cleveland and on the same day Charles B. Cleveland, joined by his wife, deeded the property to "R. Godson and Edith Marie Godson, husband and wife, as tenants by the entireties." These deeds were delivered on October 18th but not recorded until December 30, 1940. Books were opened for the partnership, Godson Properties, as of October 18, 1940. The opening entry charged cash on hand $10,000 and credited the investment account of R. Godson with $5,000 and E. M. Godson with $5,000. $6,664.90 of the cash was used as a down payment on the purchase of Oceanic Villas Apartment Hotel property. The $5,000 credited to E. M. Godson was given to her for that purpose by her husband R. Godson on October 18, 1940. The gift was duly reported in a gift tax return and in a donee's information return. Mrs. Godson has not withdrawn any sums from the partnership nor did she receive any compensation for her services, which consisted of stenographic work, collection, and general office supervision. Oceanic Villas Apartment Hotel was leased on or about October 24, 1940, for a term of *153 99 years, and on or about the same date advance rentals in the sum of $38,000 were received from the lessee. The respondent determined that the entire income of Godson Properties up to and including December 15, 1940 is taxable to petitioner R. Godson - resulting in additional taxable income of $19,469.66 over and above the amount reflected in the original return filed. Petitioners contend that at the time the lease of Oceanic Villas Apartment Hotel was executed they owned Oceanic Villas Apartment Hotel as tenants by the entirety and that each was the beneficial owner of one-half of the $38,000 received from the lessee of that property on or after October 24, 1940. They further contend that for all practical purposes a partnership relation existed between them after the execution of the partnership agreement on October 18, 1940, notwithstanding the fact that she did not become a "free dealer" until 1941 and, prior thereto, her separate property could not be reached for partnership debts under the laws of the state of Florida. [Opinion] The respondent contends that regardless of the lodging of legal title in petitioners as tenants by the entirety the actual and equitable *154 interest in the property resided in R. Godson and that he is taxable with all the income-therefrom. The respondent argues that on October 18, 1940, R. Godson purportedly gave his wife $5,000 which was set up to her credit in an investment account on the books of the alleged partnership between them; that on the same date payment was made from this fund to purchase Oceanic Villas Apartment Hotel from Ocean Front Properties, Inc., a corporation, all the stock of which was owned by R. Godson; that the deed executed October 18, 1940, but dated October 1, 1940, conveyed title to R. Godson. That a profitable lease had been negotiated with another corporation and was about to be consummated, making it advantageous to R. Godson, from an income tax standpoint, to divide the prospective income from the lease and that these facts bring this case within the rationale of Earp v. Jones, 131 Fed. (2d) 292, cert. denied 318 U.S. 764, and cases there relied on, i.e., Harrison v. Schaffner, 312 U.S. 579; Burnet v. Leininger, 285 U.S. 136; Lucas v. Earl, 281 U.S. 111; Gregory v. Helvering, 293 U.S. 465 and Helvering v. Clifford, 309 U.S. 331. *155 These cases enunciate the rule that one who earns income, or one having the right to enjoy income, cannot avoid the payment of income tax by anticipatory arrangements including the multiplying of one economic unit into two or more by devises, which, although valid under state law, would not be conclusive on the Federal government under the Federal income tax law. We cannot agree with petitioner's contention that the advanced rental was taxable as partnership income or, in the alternative, that one-half of such rental was income taxable to Mrs. Godson as a tenant by the entirety. If it were necessary to our conclusions, we would hold that since Mrs. Godson did not become a free dealer until February 1941 and could not therefore legally act as a partner in a real estate firm until that date, she had no legal status as a partner during the year in which the income was received. As to her claim to an equitable right to participate in the profits because of her alleged contribution of $5,000 toward the family partnership, we would hold that since this $5,000 was immediately repaid to Ocean Front *156 Properties, Inc., an alter ego of her husband, R. Godson, the original source of the $5,000, there was not sufficient substance to the whole transaction to invest Mrs. Godson with any equity. If it were necessary to pass on Mrs. Godson's right to claim, for purposes of income taxation, one-half of the income from the real estate held by her and her husband in the entirety, without proving that any of this income was actually received by her to her own use, we would again hold against her contention. We, of course, are aware of the formidable array of decisions, [1] to the contrary pertaining to income taxation in other states; and also the General Counsel's Memoranda on this subject pertaining to Florida. However, the Supreme Court of Florida in Anderson v. Trueman, 100 Fla. 727, (130 So. 12) holds that estates by entireties in Florida are *157 not part of married women's separate property within the contemplation of the constitution and the various married women's property acts. It would seem, therefore, that the common law right of the husband to the entire income from the property from real estate held in the entirety by the husband and wife still pertains in Florida. This would create at least a reputable presumption that he had received such entire income. Since Mrs. Godson makes no claim that she actually received any of this income she has not removed this presumption. Entirely independent of the above considerations, however, we are rejecting the contentions of the petitioner because we are impressed that the whole arrangement pertaining to the partnership and the creation of the estate by the entirety smacks rather of a juggling of family income for the purpose of avoiding income taxation rather than of a bona fide arrangement for the real conduct of business. Although petitioners say that the partnership plan had been in their minds for some time, no acts were performed in promoting either the partnership or the estate in entirety until after the arrangements for a very profitable lease had progressed to a critical *158 stage. In fact, petitioners' attorney either on, or immediately after, October 15th advised petitioners to hold up the creation of the estate in entirety until after the lease was signed. Obviously none of petitioners' plans for a partnership or for an estate in entirety were made to promote the business out of which the taxable income arose. The business was advanced almost to fruition before any steps were made to effectuate those plans. The plans for an estate in entirety were actually retarded to avoid interfering with petitioners' business. These plans were consummated by the recording of the deed only after the business which produced the taxable income was wholly finished. Under such circumstances, and with particular attention to the fact that the income involved is all family income and that the partnership and corporation involved are all wholly owned family affairs, no court entrusted with the interpretation of our tax laws could view this situation with indifference. Such income is taxable only to the member of the family who produced it; in this case R. Godson. Issue VII The question raised by this issue is whether R. Godson, hereinafter referred to as petitioner, *159 or Godson Properties realized taxable income, representing the difference between the amount of prepaid insurance prorated between seller and purchaser and lessor and lessee, in respect to Oceanic Villas Apartment Hotel in 1940. [The Facts] On October 17, 1940, petitioner, R. Godson, purchased Oceanic Villas Apartment Hotel and on October 18 caused that property to be transferred to himself and wife as tenants by the entireties. In the closing statement between the parties to the sale, the petitioner, R. Godson, was charged with prepaid insurance in the amount of $810.70. It was later discovered that the amount so charged was erroneous and should have been $1,178.76. A correcting entry was made on the books of petitioner and his wife, which were kept under the name of Godson Properties, by charging an additional $368.06 to prepaid insurance. On October 24, 1940 petitioner and his wife leased Oceanic Villas Apartment Hotel to a corporation known as Oceanic Villas, Inc. In the closing statement between the lessee and the lessor, the lessee was charged and the lessor credited with prepaid insurance in the sum of $1,178.76. The respondent determined that the difference between *160 the $810.70 charged to petitioner R. Godson upon the purchase of the property, and $1,178.76 charged to the lessee, or $368.06, was income to R. Godson. The petitioner contends that the lessors paid for this insurance as evidenced by the closing agreement for the sale of the property to R. Godson, and the bookkeeping entries correcting the error in the closing agreement did not result in realized income. [Opinion] In our judgment petitioner realized income in the amount of $368.06 through the charge to the lessee of prepaid insurance in the amount of $1,178.76. This insurance had presumably been taken out and paid by the Ocean Front Properties, Inc., before the sale to petitioner, R. Godson. In that transaction petitioner Godson was charged with only $810.70 prepaid insurance. There is no evidence that the subsequent corrective book entries resulted in any additional expenditures by the purchaser. The closing statement between the lessors and lessee, however, took into account prepaid and deferred charges resulting in a charge to the lessee of prepaid insurance in the amount of $1,178.76, or $368.06 more than was charged to the purchaser. This transaction resulted in income *161 to petitioner of $368.06. Issue VIII [The Facts] During the latter part of September, 1940, Ocean Front Properties, Inc., a corporation which then owned Oceanic Villas Apartment Hotel, made an agreement with Paul Van Cleve to pay him $2,500 as commission if he would secure "a signed completed and accepted 99 year lease for the property." After a lessee had been found by Van Cleve and the lease was in preparation the deed from Ocean Front Properties, Inc., to R. Godson was executed on October 17, 1940. On October 18, 1940, R. Godson and Edith Marie Godson, his wife, joined in a deed conveying the same property to Charles B. Cleveland. On the same date Charles B. Cleveland and Dorothy Cleveland, his wife, executed and delivered a deed to this property to R. Godson and Edith Marie Godson as tenants by the entireties. On October 24, 1940, petitioners leased Oceanic Villas Apartment Hotel to Oceanic Villas, Inc., a lessee secured by Van Cleve, for a term of 99 years. Petitioners thereafter paid Van Cleve as commissions for securing the lessee $2,000 in 1940 and $500 in 1941. These respective amounts were claimed as deductions on the partnership returns filed by petitioners for *162 the years 1940 and 1941. The respondent has denied the deductions. The lessee defaulted in the payment of rent eleven months after the execution of the lease and petitioners instituted legal proceedings for cancellation of the lease and repossession of the property. The litigation was still pending on June 31, 1945, the date of the trial of this proceeding. The sole question here is whether any amount is deductible in the taxable years for commissions paid an agent for securing a lessee for the property. The petitioner contends that the commissions paid are deductible in the years paid. He argues that the lessors, believing the lessee would default the first bad year, regarded the lease as a lease from year to year, and, since the lessee actually defaulted in 1941, the lease should be so regarded for tax purposes in order to property reflect income. He contends in the alternative that if the lease is found to be a lease for 99 years then the unamortized portion is deductible in 1941 when the lessee defaulted in payment of rent. In computing the deficiency in question the respondent treated the lease as having a term of 99 years and amortized the commissions over that term. On *163 brief he contends that none of the commissions are deductible since the agreement with Van Cleve was executed by Ocean Front Properties, Inc., and petitioners had no liability for the services rendered by him. [Opinion] We cannot agree with respondent's contention raised on brief. It is true that there was no formal assignment of the Van Cleve contract to petitioners but at the time of the sale of the property to them the lease was being negotiated with the client secured by Van Cleve. The petitioner continued negotiations with this client and subsequently leased the property to it. He therefore became equitably liable to Van Cleve for a reasonable commission. We think the commissions paid were reasonable expenditures incurred in leasing the property. Such expenditures are of a capital nature and are ordinarily exhaustible over the term. Harriet B. Borland, et al., 27 B.T.A. 538; John Tonningsen, et al., 22 B.T.A. 738, aff'd 61 Fed. (2d) 199; Mary C. Young, et al., 20 B.T.A. 692, aff'd 59 Fed. (2d) 691, cert. denied 287 U.S. 652. The petitioner's contention that the lease was actually a lease *164 from year to year finds no support in the record except in the selfserving testimony of petitioner Godson. In our judgment the instrument is clear and unambiguous. It is a lease for 99 years and the commissions paid should be exhausted over that term unless, as petitioner contends in the alternative, the unamortized portion is deductible in 1941 when the lessee defaulted in payments of rent. In our judgment petitioner's alternative contention must fail. The evidence is that when the lessee defaulted in payments of rent about September 15, 1941, the petitioners began legal action to secure cancellation of the lease and possession of the property. Petitioner R. Godson was appointed receiver during the litigation, which was still pending at the time of the hearing, February 1, 1945. It thus appears that four years after the default in payment of rents the lease had not been cancelled, but exhaustion of the commissions paid would ratably continue each year regardless of whether the payments were made or not. Virginian Hotels Corp. of Lynchburg v. Helvering, 319 U.S. 523. We hold, therefore, that only a ratable portion of the commissions paid for securing the lease was *165 deductible in the respective years 1940 and 1941, spread over the term of 99 years. Issue IX [The Facts] On October 24, 1940, petitioners leased the property known as the Oceanic Villas Apartment Hotel to Oceanic Villas, Inc., for a term of 99 years. On September 15, 1941, the lessee defaulted in payment of its rent and petitioners instituted legal proceedings to recover possession of the property. On November 24, 1941, an entry on petitioner's books showed a payment to Lee & Frazel, Inc. of $75 charged to "legal", and on October 11, 1941, a payment to "Brigham" of $15 charged to "legal." Petitioners seek to deduct these sums as legal expenses incurred in the suit for the possession of property held for the production of income under Section 23(a) of the Revenue Act of 1938 as amended by Section 121 of the Revenue Act of 1942. The respondent was denied the deduction. It is the contention of the respondent that the two items totaling $90 were not incurred as ordinary and necessary expenses in the management and conservation of petitioners' property. [Opinion] The only evidence before us are the entries in petitioners' books. These are not only meagre, as petitioner *166 admits, but are entirely inadequate to prove petitioners' contention and we are unable to determine from the evidence whether the claimed expenditures had any relation to the action by petitioners for possession of the leased property. Petitioners argue that the date of the entries is sufficient to show the nature of the expenditures particularly since other legal expenditures are identified as being in connection with other projects. We cannot agree. On the record before us we hold that petitioners have failed to overcome the prima facie correctness of respondent's determination, which in such circumstances must be affirmed. Issue X Two questions are raised under this issue, (1) What is the correct allocation of the cost to petitioners ($195,000) of the Oceanic Villas Apartment Hotel, between land, buildings, furniture and equipment, and the rate of depreciation applicable to each for the taxable years 1940 and 1941? (2) What, if any, depreciation is deductible upon a residence at Surfside, Florida, purchased by petitioners on November 14, 1940? [The Facts] On or about October 18, 1940, petitioners, operating as Godson Properties, acquired improved real estate known as *167 Oceanic Villas Apartment Hotel, together with furnishings and equipment therein, for a purchase price of $195,000. Petitioner Godson, who had been building, equipping, furnishing, selling and operating hotels and other buildings throughout the United States and Canada for some twenty-five years, had two independent appraisals made of the property and, after adjusting those appraisals, arrived at the following allocation of the purchase price: Land
$ 49,000.00
Buildings
100,000.00
Furniture
36,048.71
Kitchen Equipment
7,653.69
Linens
1,465.01
Glass and Silverware
832.59
Total
$195,000.00
The hotel-apartment buildings were of concrete block, stucco construction, of a non-nreproof character with wooden partitions and floor joists. In attempting to arrive at correct depreciation figures, Godson consulted with other hotel operators in the area as to their depreciation rates and also consulted with his firm of accountants. He also took into consideration the nature of the usage to which the buildings would be subjected. After considering the advice he had received and after applying his own extensive knowledge in such matters, he determined that the buildings *168 had a maximum useful life of 33 1/3 years, the furniture 10 years, the kitchen equipment 5 years, and the linens, glass and silverware 3 years. Respondent changed the allocation of purchase price as well as rates of depreciation as follows: Estimated
Description of Property
Cost
Useful Life
Buildings: No. 1
$ 68,767.62
38 years
No. 2
48,510.92
40 years
$117,278.54
Furniture
13,928.76
10 years
Furniture
4,901.41
12 years
$ 18,830.17
Kitchen Equipment
7,653.69
10 years
Linen
1,405.01
Replacement Basis
Glass and Silverware
832.59
Replacement Basis Total cost extracted from above is $146,000, leaving $49,000 allocated to land out of total purchase price. In a partnership return Godson Properties deducted depreciation on the hotel property furnishings and equipment for the year 1940 as follows: Depreciation
Amount
Property
Cost
Rate
Deducted
Buildings
$100,000.00
3%
$ 625.00
Furniture
36,048.71
10%
751.00
Kitchen Equipment
7,653.69
20%
318.00
Linen
1,465.01
33 1/3%
101.77
Glass and Silverware
832.59
33 1/3%
57.80
Total
$1,854.47 Respondent determined that petitioner Godson alone *169 was entitled to deduct depreciation on the above-described property for the period from October 1, 1940, to December 15, 1940, and allowed him a deduction of $1,163.14 therefor. For the calendar year 1941, Godson Properties applied the same allocation and rates as had been used by it in 1940 for the above-described property. Respondent also used the same allocations and rates which he had applied in 1940 as a basis for disallowing depreciation claimed by Godson Properties on the property. On November 14, 1940, petitioners purchased a concrete block-stucco residence located in Surfside, Florida, at a cost of $28,500. The property was purchased for a business purpose. The purchase price was allocated by petitioners for purposes of depreciation, $14,500 to land and $14,000 to buildings, and in their 1940 return petitioners deducted $175 as depreciation on the building using a period of 10 years as the remaining useful life of the old building. In June or July 1941 petitioner demolished approximately one-fifth of the building to make room for the erection of a hotel building which included the remaining portion of the old building, and after making adjustments for the demolished *170 portion deducted $1,250 depreciation on the building for the taxable year 1941. The respondent denied the claimed deductions for both taxable years. [Opinion] The petitioners contend that their allocation of cost and the rate of depreciation on the Oceanic Villas Apartment Hotel was fair and represented the best judgment of two independent appraisals of the property. The respondent stands on the prima facie correctness of his determination. There is some evidence in the record that in a subsequent year the respondent adopted both the allocation and rate of depreciation on the buildings contended for here by the petitioner but however that may be such a fact would not be controlling here. On the whole record we find the following allocation of cost and rate of depreciation on the property in question to be as follows: Rate of
Cost
Depreciation
Buildings
$100,000.00
3%
Furniture
36,048.71
10%
Kitchen Equip-
ment
7,653.69
20%
Linen
1,465.01
Replacement Basis
Glass and Silver-
ware
832.59
Replacement Basis
The petitioners contend that the residence purchased in 1940 was acquired and held for the production of income and, therefore, *171 they are entitled to deduct depreciation thereon. In Issue II, supra, we held that the undepreciated cost of the portion of the building which was demolished to make room for the hotel building should be capitalized. In accord with that decision the petition is not entitled to allocate any depreciation to the portion demolished in either of the taxable years. As to the portion of the building which was retained and used in connection with the hotel erected, there is no question but that the taxpayer is entitled to deduct a reasonable amount for depreciation, but the burden of proof is upon the petitioners to sustain the deduction claimed. The proof offered by petitioners consists of little more than a restatement of the facts set out in the partnership return. There is no evidence of the age of the building, of its physical condition or its remaining useful life. These are facts so pertinent to the issue that they cannot be omitted from the record if petitioners would sustain their burden of proof. We hold that petitioners have not shown that the determination made by the Commissioner is *172 erroneous and, therefore, the Commissioner's determination is sustained. Issue XI The question presented by this issue is whether petitioner R. Godson is entitled to a deduction in the taxable year 1940 for a long term capital loss incident to the disposition of 472 shares of preferred stock of Locketon Investments, Ltd., in that year. [The Facts] On September 23, 1932, petitioner R. Godson entered into a contract with Adjusto-Roll-Screens, Ltd., a Canadian Corporation controlled by him, for the construction of a 52-room hotel in Williamsburg, Ontario, Canada. Under the terms of the contract petitioner agreed to furnish certain labor and materials and to complete the erection of the building by December 31, 1932, in consideration of $1,245 to be paid by the issue to him of 1,245 shares of the no par common stock of the company, and $50,000 to be paid by the issue to him of 500 preferred shares of the company. The 52-room hotel building was completed and put in operation either in the latter part of December 1932, or early in January 1933, and the stock was issued to petitioner in January 1933. In accordance with the contract the name of the corporation was changed to Locketon *173 Investments, Ltd. In connection with the construction of the 52-room hotel building petitioner borrowed $25,000 from one bank and $17,000 from another. He also arranged for the purchase of some of the building material on terms as long as three or four years. The total cost of the 52-room building was $80,565.81. Of this amount $51,245.20 was paid by petitioner. In the first year of its operation the hotel had gross rental income of $61,979.11 and net operating profit of $20,946.12, before depreciation and manager's commission. A high rate of depreciation was claimed because its useful life depended on the continued life and practice of Dr. Locke. Prior to the completion of the 52-room hotel building the corporation decided to increase its size to 125 rooms and the corporation agreed to pay petitioner an additional sum of money for the work. The arrangements for the additional construction were covered in a series of supplemental agreements some of which were oral and others were embodied in the minutes of the corporation. The total cost of the hotel with the additions in 1933 was $106,721.23. A part of this amount was paid by the corporation from current earnings and the balance *174 paid by petitioner. The Dominion of Canada tax authorities and the tax authorities for the Provice of Ontario investigated the cost of the hotel in order to establish the cost for depreciation purposes. As a result of their investigation they found that the completed 125-room structure had cost $106,721.23. They also determined the cost to petitioner of 500 preferred shares of Locketon Investments, Ltd., was $50,000 and the 1,245 common shares was $1,245. At the time of their investigation all books and records were available. Locketon Investments, Ltd., was controlled by petitioner and operated as his alter ego. He proposed to forego profits of $10,000 arising from the construction of the hotel and this proposal was accepted by the board of directors. The hotel was built for the purpose of catering to persons who came to Williamsburg to be treated by Dr. Locke. There was only a slight demand for it other than Dr. Locke's clientele. The profit and loss account of Locketon Investments, Ltd., for the year ending December 31, 1939, showed total income from the operation of the hotel and revenue from other sources to be $29,270.98 and expenses in the amount of $26,494.16 leaving net *175 profit before depreciation of hotel building of $2,776.82 and net loss after depreciation of $529.40. At that time there was a mortgage indebtedness on the hotel in the amount of $21,500. In 1940 petitioner wanted to realize a stock loss in order to obtain an income tax deduction. Accordingly he tried to sell 472 shares of preferred stock in Locketon Investments, Ltd., through several brokerage houses and through friends. Failing in this, he offered the shares to his attorney, Charles B. Cleveland, who was a director of the company, for $944. The hotel was then under lease with an option in the lessee to purchase it for $18,000. The property was incumbered with a mortgage in the amount of $16,252. On December 27, 1940, Cleveland gave petitioner his check for $944 and a new certificate was issued to Cleveland covering the 472 and 25 shares which Mrs. Godson transferred to him on the same date. Cleveland's check for $944 was deposited by petitioner in the Miami Beach First National Bank December 27, 1940. During 1941, Dr. Locke's illness caused the business to fall off and the optionee decided not to exercise his option to purchase. Cleveland evidenced dissatisfaction over the deal *176 and petitioner repurchased the stock for $100. Petitioner gave Cleveland his note for $100 on Cleveland's agreement to surrender the stock to him when the note was paid. About a month after the agreement Dr. Locke died and Cleveland turned the stock over to petitioner without having received anything for it except the note which has never been paid. The certificates originally issued to petitioner were exhibited at the hearing in these proceedings. They had not been cancelled and bore no evidence that they had been transferred to Cleveland. On March 12, 1942, a transfer tax return was made to the Province of Ontario showing the transfer on December 27, 1940, to Cleveland of 472 shares (par value $100) by petitioner at $2 per share, and 25 shares by his wife on the same date at $2 per share. In his income tax return for 1940, petitioner claimed a long term net capital loss of $23,128 from the sale of 472 preferred shares of Locketon Investments, Ltd. The respondent disallowed the claimed loss. The petitioner contends (a) that the cost to him of 472 shares of Locketon preferred stock was $100 per share or $47,200, (b) that he realized a loss on the sale of the stock to Charles B. *177 Cleveland in 1940 of $98 per share. The respondent contends (a) that the cost to petitioner, if any, is not determinable from the evidence, (b) that there was no bona fide sale of the stock by petitioner to Cleveland in 1940. [Opinion] The issues here involve questions of fact to be determined by all of the facts and circumstances surrounding the transactions. The first contention of the respondent is answered by our finding that petitioner Godson paid $100 per share for the preferred stock of Locketon Investments, Ltd. We think this finding is amply substantiated by the facts and it is unnecessary to elaborate on it here. We therefore hold that the cost to petitioner of the preferred stock in question was $100 per share, or $47,200. The second question raised by the respondent refers to the bona fides of the alleged sale of this preferred stock to petitioner's attorney, Charles B. Cleveland, on December 27, 1940. The fact that this sale was made to petitioner's attorney does not form the basis of much confidence in the transaction. This is especially true when considered with the additional fact that petitioner's attorney was then, and had been for some time, employed in *178 advising petitioner on his income tax matters and this attorney had actually participated in the chain of title in creating the estate of entirety whereby petitioner and petitioner's attorney proposed to reduce petitioner's tax liability. If this attorney would accept the title to real estate and then reconvey it to petitioner in order to benefit petitioner's income tax position, it is immediately suggested that he would accept temporarily the title to this preferred stock for the same purpose. The fact that petitioner preserved the deposit slip showing the deposit of the money alleged to have been paid by Cleveland to him for the stock and yet was unable to produce the stock certificate issued to Cleveland, or to produce any mark of cancellation on the old certificate which he had originally held would be some indication at least that this stock certificate, if delivered to Cleveland at all, was merely delivered to him for the purpose of holding until the tax questions for the year 1940 were all settled. Furthermore, it is most difficult to explain why the petitioner herein did not have the stock transfer recorded in the Province of Ontario until March 12, 1942, over two years after *179 the alleged sale, unless petitioner was keeping himself in position on the record to repossess this stock at any time favorable to him and with a minimum of expense. The unexplained animosity between petitioner and his attorney, even after the giving of the note for $100 by petitioner to his attorney, could be accounted for by the fact that petitioner had given his attorney assurance that the stock could be returned to petitioner at any time Mr. Cleveland desired. Furthermore, it is a little difficult to understand why an attorney with the evident keen mind which the record indicates he possessed would invest $944 in the non-voting stock of a corporation with very little anticipation of substantial profits, even if everything turned out for the best and with the corporation located in Canada where, if events became unfavorable, it would be necessary for him to go to enforce liquidation. Our observation of qualified members of the legal profession makes the acceptance of petitioner's story almost impossible. The complete absence of any testimony from Mr. Cleveland himself does not add to our confidence that he would corroborate petitioner if called upon to testify. If he was in the *180 military forces, as stated at the hearing, suitable arrangements could have been made by continuance or otherwise to get his testimony if it had been desired by petitioner. It is our conclusion that the sale of 472 shares of preferred stock on December 27, 1940, was not a bona fide sale. Issue XII The question presented under this issue is whether petitioner Edith M. Godson realized a deductible long term capital loss on a sale to Charles B. Cleveland of 25 shares of preferred stock of Locketon Investments, Ltd., in 1940. [The Facts] Prior to her marriage to R. Godson, petitioner Edith M. Godson was employed by him as his secretary. At that time both were residents of Canada. In the latter part of 1932 or the early part of 1933 petitioner, then known as Edith M. Price, acquired 25 shares of the preferred stock of Locketon Investments, Ltd., at a cost to her of $100 per share. On or about December 27, 1940, the 25 shares of Locketon Investments, Ltd., owned by petitioner were transferred to Charles B. Cleveland. A check from Cleveland for $50 was received and posited to her credit in the Miami Beach First National Bank and a transfer tax return filed in the Province of *181 Ontario, Canada, evidencing a transfer of 25 shares of the preferred stock of Locketon Investments, Ltd., and a tax thereon of seven cents. Subsequently in 1941 the stock was reacquired by R. Godson together with 472 preferred shares originally owned by him by giving his note for $100. At the time of the hearing in these proceedings, January 31, 1945, the note had not been paid. [Opinion] The identical question raised here was discussed in the preceding issue (Issue XI) and decided adversely to the petitioner there. The same facts apply to the purported sale of the stock here. The respondent's determination is sustained. Issue XIII [The Facts] During September 1940 petitioner R. Godson made a trip to Canada to look after his various business interests there. At that time he had interests in apartment houses in Toronto, Hamilton and Ottawa, and residential property in Toronto in addition to his interest in Locketon Investments, Ltd. He also had legal matters to attend to in connection with property he had sold eight or ten years previously, the purchasers having defaulted on the mortgages. He deducted $567.90 as expenses of this trip. In arriving at this amount he estimated *182 his expenses at $10 per day and included the exact amount of railroad, plane and bus fare. He was away on this trip for 42 or 47 days. His wife did not accompany him. [Opinion] The sole question presented is whether the claimed expenses incident to petitioner's business trip to Canada are deductible under Section 23 of the Revenue Act of 1938 as retroactively amended by Section 121 of the Revenue Act of 1942. [2]
*183 The petitioner contends the deduction should be allowed either as a business expense or as a non-business expense incurred for the management, conservation, or maintenance of property held for the production of income. The respondent contends that the petitioner has not shown himself entitled to the deduction claimed. From the record before us it appears that petitioners' interests in Canada consisted of investments rather than a business regularly carried on by him. Petitioner has not shown that they were ordinary and necessary expenses incurred in carrying on a trade or business. We therefore hold that the expenses in question are not deductible as business expenses within the purview of Section 23 (a)(1)(A) of the Revenue Act of 1938 as amended. It appears that petitioner had extensive interests in property in Canada which was held for the production of income, in addition to his interest in Locketon Investments, Ltd., and that the trip to Canada was for the purpose of looking after these investments and attending to certain legal matters in connection with some of the properties. It further appears that Dr. Locke was in bad health and that the success of Locketon Investments, *184 Ltd., depended almost entirely on his clientele. The respondent admits it was a business trip and there is nothing in the record to indicate that it had any other purpose. The obvious purpose of such a trip was the management, conservation, or maintenance of the income producing property. We hold therefore that the expenses incurred are deductible under Section 121 (a) (2) as non-business expenses. The deduction should, however, be limited to 42 days since the petitioner has not shown the trip was of longer duration. Issue XIV Under this issue petitioner R. Godson alleged error in disallowing a loss on capital assets in the amount of $234.73. This issue has been abandoned by the petitioner. Decision will be entered under Rule 50. Footnotes
1. George K. Brennen, 4 T.C. 1260; Daniel Upthegrove, 33 B.T.A. 952; George E. Saulsbury, 27 B.T.A. 744; Herman Gessner, 32 B.T.A. 1258; Paul G. Green, 7 T.C. 19 (promulgated June 17, 1946) G.C.M. 3111, C.B. 1928, P. 112; and I.T. 3235↩, C.B. 1938-2, p. 160.
2. SEC. 121. NON-TRADE OR NON-BUSINESS DEDUCTIONS. * * * * *
(a) Expenses. - (1) Trade or Business Expenses. - (A) In General. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including * * * traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business * * * * *
(2) Non-trade or non-business expenses. - In the case of an individual, all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income.↩